UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

TASHA HUDSON )
)
V. ) NO. 2:10-CV-248
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security )

<u>REPORT AND RECOMMENDATION</u>

The matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. This is a judicial review of the administrative denial of the plaintiff's applications for childhood disability, supplemental security benefits, and disability insurance benefits under the Social Security Act. Both the plaintiff and the defendant Commissioner have filed dispositive Motions [Docs. 8 and 15].

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision

must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human Services*, 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was born on February 25, 1988.[1] She alleged a disability onset date of July 1, 2003. Oddly, although the ALJ correctly found she had not engaged in substantial gainful activity since her alleged onset date, she was employed long enough to have had disability insurance benefits coverage from January through September of 2007. The jobs which led to this short period of coverage did not constitute past relevant work because of their brief duration.

Plaintiff alleges disability due back problems, as well as depression, bipolar disorder and schizophrenia. The medical evidence is summarized by her counsel in her brief as follows:

> Plaintiff received treatment at Kingsport Medical Center from February 1, 2008 through April 20, 2008, due to uncontrolled migraine headaches associated with nausea, uncontrolled chronic low back pain with scoliosis, carpal tunnel syndrome with tendinitis, neuropathy in the hands, right forearm pain, insomnia, excessive crying, excessive appetite, obesity, and left foot injury. Exams were remarkable for paresthesias of both inner thighs, frustrated appearance, tenderness across the thoracic and lumbar spine and paraspinal muscles, discomfort with internal and external rotation of the hips, positive Tinel's on the left, and point tenderness over the radial collateral ligament and the epicondyle (Tr. 314-323).
> On April 14, 2008, Plaintiff presented to Frontier Health with complaints of mood swings, inability to be in crowded places, decreased ability to breathe, decreased memory, decreased sleep, decreased appetite, and difficulty with concentration. Presenting problems were noted to include social/interpersonal, problems coping with

---

[1] In order to receive child disability benefits, she must show she was disabled before her 22nd birthday, February 23, 2010.

daily living, and depression or mood disorder. Plaintiff's severe symptoms were noted to include academic or work inhibition, aggression or rage, social withdrawal, anxiety, panic attacks, memory impairment, poor attention or concentration, and insomnia, with moderate symptoms including jitteriness, phobic responses, depressed mood, hopelessness, irritability, loss of interest or pleasure, low self-esteem, marked mood shifts, and tearfulness. The diagnoses were major depressive disorder, single episode, moderate, and rule out dysthymia (Tr. 327-331). Plaintiff returned for psychiatric evaluation on April 28, 2008, at which time her fragmented sleep continued. The diagnoses were major depression, first episode, moderate, without psychosis; likely dysthymia; and partner relational problems (Tr. 324-326).

Plaintiff continued treatment at Kingsport Medical Center from May 18, 2008 through July 14, 2008, due to chronic low back pain, depression, bipolar disorder, possible schizophrenia, right great toe contusion, and migraine headaches associated with photophobia (Tr. 332-338). On July 14, 2008, lumbar spine x-rays showed levoscoliosis in the lumbar spine and minimal bulge at L5-S1 (Tr. 334).

On July 30, 2008, a reviewing state agency physician opined Plaintiff is moderately limited in her ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; and to interact appropriately with the general public (Tr. 339-356).

Plaintiff received treatment at Holston Valley Medical Center on three occasions from April 20, 2008 through July 30, 2008, due to left foot injury, urinary tract infection, pelvic pain, and constipation (Tr. 157-367).

On October 29, 2008, a reviewing state agency psychologist opined Plaintiff is markedly limited in her ability to interact appropriately with the general public and moderately limited in her ability to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting (Tr. 368-381, 396-399).

On July 18, 2009, Plaintiff underwent consultative exam by Beth Ballard, M.A. Presenting complaints included bipolar disorder, depression, back pain, difficulty getting along with others, difficulties with short-term memory, crying spells, not wanting to be around others, lack of energy and motivation, poor sleep and appetite, low sexual interest, and history of suicide attempt at age 12. WAIS-III testing yielded a Verbal IQ score of 86, a Performance IQ score of 91, and a Full Scale IQ score of 88. The diagnosis was dysthymic disorder. Ms. Ballard opined Plaintiff is mildly limited in her ability to interact appropriately with the public, supervisor(s), and coworkers (Tr. 413-421).

Plaintiff received treatment at Indian Path Pavilion from October 14, 2008 through December 23, 2008, during which time she carried the diagnoses of bipolar disorder and major depressive disorder. Conditions and complaints addressed during treatment include frequent crying spells, poor attention/concentration, poor impulse

3

control, anger outbursts, past thoughts of suicide with one previous attempt, feeling worthless and sad, feeling hopeless, decreased libido, excessive guilt, feeling helpless, insomnia, family difficulties, severe mood swings, irritability, racing thoughts, weight gain, decreased energy, depression, anxiety, and pulling her hair to the point of leaving bald spots. Mental status exams were remarkable for depressed mood with mood congruent affect, impaired judgment, limited insight, nail and finger biting, and circumstantial thought processes (Tr. 422-441).

[Doc. 9, pgs.2-5].[2]

At the administrative hearing, the ALJ took the testimony of Ms. Donna Jane Bardsley, a vocational expert ["VE"]. He asked Ms. Bardsley to consider a person of plaintiff's age, 10th grade education, and having no past relevant work. He asked her to assume that she had the physical capacity to perform medium work as opined by the State Agency physician at Tr. 404-412. She identified thousands of jobs in the regional economy and millions in the national economy which such a person could perform. He then asked Ms. Bardsley to consider the opinion of Ms. Ballard regarding the plaintiff's mental impairment and whether that would affect the jobs plaintiff could perform. Ms. Bardsley stated that would have no impact on plaintiff's ability to perform these jobs. [Tr. 42-43]. Ms. Bardsley then testified that if the plaintiff's subject complaints were true there would be no jobs which she could perform. [Tr. 44].

Counsel for plaintiff then asked what impact the limitations opined by State Agency Psychologist Joslin [Tr. 396-99] on October 29, 2008, would have on the number of jobs. Ms. Bardsley stated that "a combination of those ratings there would eliminate all jobs." [Tr. 44]. On further examination by the ALJ, Ms. Bardsley testified that if the functional capacity

---

[2]Aspects of the medical record dealing *solely* with plaintiff's physical problems were omitted in that plaintiff raised no argument regarding the physical component of the ALJ's finding of residual functional capacity. In any event, there was substantial evidence regarding the ALJ's findings relative to the plaintiff's physical complaints.

4

assessment [Tr. 398] were separated from the rest of Joslin's form, "it would be a different answer." [Tr. 45]. In other words, if plaintiff was "able to understand and remember simple and detailed" instructions; "able, with some difficulty, to maintain attention, concentration, persitence and pace;" unable to interact appropriately with the general public;" and "able, with some difficulty to adapt to changes" in the work environment, Ms. Bardsley's statement that there were no jobs the plaintiff could perform would be modified to some unknown extent.

In his hearing decision, the ALJ found that the plaintiff had severe impairments of a back disorder and depression [Doc. 20]. He discussed some of the medical evidence. Contrary to plaintiff's assertion in her brief, he did discuss her treatment at Indian Path Pavilion [Tr. 20]. But, as stated by the plaintiff, he stated that "the medical evidence of record does not reflect" a diagnosis of Bipolar disorder or Schizophrenia "from any treating or examining medical source." [Tr. 21]. Also, as alleged by the plaintiff, the ALJ did not discuss in any detail the findings of the State Agency mental health consultants, but stated that he "notes the findings of the State Agency and finds that these opinions are consistent with the finding that the claimant is not disabled and finds that these findings are not consistent with the findings of the Administrative Law Judge." [Tr. 23].

He did state, even though he found a severe mental impairment of depression and included Ms. Ballard's opinion in his question to the VE, that the "depression does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere." [Tr. 21].

He found that the plaintiff had the residual functional capacity to perform medium

5

work, with mental limitations of the degree opined by Ms. Ballard. [Tr. 22]. Based upon the testimony of the vocational expert, he found that there were a significant number of jobs which the plaintiff could perform. Accordingly, he found that she was not disabled. [Tr. 25-26].

Plaintiff asserts that the ALJ did not give appropriate consideration to the findings of the State Agency mental health evaluators, which were facially more restrictive than those of Ms. Ballard, who consultatively examined the plaintiff and which the ALJ incorporated into his RFC finding. More importantly, plaintiff points out that he did *not* discuss why he did *not* accept their findings. Plaintiff further asserts that the ALJ erred in his statement that there was no evidence from any examining or treating source that she had Bipolar disorder or schizophrenia. She also states that the ALJ's opinion is inconsistent because he finds the severe impairment of depression in one place and later states that she does not have a severe mental impairment.

With respect to the complaint that the ALJ erred in finding and then not finding a severe mental impairment, any error in this regard was rendered harmless by his inclusion of Ms. Ballard's limitations in the hypothetical to the VE. The key question is whether or not Ms. Ballard's opinion constitutes substantial evidence for the ALJ's mental RFC finding.

The Court was, indeed, surprised when the State Agency opinions of Dr. Williams and Psychologist Joslin were read. From the statement of the ALJ in the opinion that those assessments "were consistent with the finding that the claimant is not disabled," the Court presumed that they were "consistent" with the findings of Ms. Ballard. They were not, showing moderate limitations some areas of functioning and a marked limitation regarding

6

the ability of the plaintiff to deal with the general public. The VE even indicated there would be no jobs the plaintiff could perform if she had the limitations in Joslin's assessment.

It is true that the ALJ is required to consider the opinions of State Agency examiners and normally to explain the weight given to those opinions. It is equally true that the well-founded opinion of someone who has actually examined a plaintiff is entitled to greater weight than that of a non-examining State Agency evaluator. Here, we do not just have an examining source competing with those non-examining sources, but an examining source's opinion which was not available to the State Agency evaluators, their opinions predating Ms. Ballard's by the better part of a year. In the opinion of this Court, her opinion, based upon an extensive examination of the plaintiff, can be substantial evidence in the face of more severe assessments by State Agency evaluators, even if they had the benefit of the examining source. But where, as here, they predate the in person examination by several months, and where the treating source evidence was sketchy and based so heavily upon subjective complaints, there is no question in the Court's mind that the ALJ could give controlling weight to Ms. Ballard's opinion and utilize it in his RFC.

Also, even though he did not discuss the findings of the State Agency examiners adequately in his opinion, the ALJ was obviously aware of them and aware of their content as evidenced by his redirect examination of Ms. Bardsley at the hearing. [Tr. 45]. Thus, it cannot be argued that the ALJ would surely have ruled in plaintiff's favor if he had been aware of the contents of the State Agency evaluators.

Is it a misstatement on the part of the ALJ to say that the State Agency personnel were "consistent" with his RFC finding? Not completely. But, the actual functional capacity is

7

found *only* in "Part III" of form SSA-4734-F4-SUP, the "Mental Residual Functional Capacity." The rest of the form, where the evaluator rates the areas of function as "not significantly limited," "moderately limited," "markedly limited" and the like is just a worksheet. Part III is the actual functional capacity assessment. These are found at pages 355 and 398 for Williams and Joslin respectively.

Williams states in his Part III that the plaintiff "could understand and carry simple tasks to lower level detailed tasks while getting along with others and adapting at that level of function with some difficulty. Would not be able to perform more complicated tasks nor deal with public except simple situations." [Tr. 355]. Joslin's is generally the same except she opined plaintiff was "unable to interact appropriately with general public." [Tr. 398]. The VE admitted that plaintiff could do some jobs if Part III alone was what she went by, which was what *she should have done.* One does not have to deal with the general public to perform the vast majority of the jobs which Ms. Bardsley identified. While these findings may not completely comport with Ms. Ballard's findings, they are certainly consistent with a finding that the plaintiff was not disabled.

With respect to the argument that the ALJ erred in not finding that treating sources had diagnosed Bipolar disorder and schizophrenia, it is significant to note that neither the State Agency doctors nor Ms. Ballard diagnosed these conditions. Even if she did have these conditions, it is the opinion on what she can do that matters. A diagnosis of these conditions does not dictate that she therefor must be disabled.

To summarize, the Court finds that Ms. Ballard's opinion provided substantial evidence for the ALJ's opinion of the plaintiff's mental RFC, and for the question asked of

8

the VE. The Court also finds that the *actual* functional capacity assessments of the State Agency evaluators were not at odds with the ALJ's ultimate finding that there were jobs the plaintiff could perform. Any errors committed by the ALJ were harmless. Accordingly, it is respectfully recommended that the plaintiff's Motion for Summary Judgment [Doc. 8] be DENIED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 15] be GRANTED.[3]

Respectfully submitted:

  s/ Dennis H. Inman  
United States Magistrate Judge

---

[3] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).